J-S49009-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ROBERT MITCHELL | : | |
| | : | |
| Appellant | : | No. 475 WDA 2020 |

Appeal from the Judgment of Sentence Entered January 21, 2020
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0009190-2019

BEFORE:   OLSON, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                           FILED NOVEMBER 20, 2020

Appellant, Robert Mitchell, appeals from the judgment of sentence entered on January 21, 2020, as made final by the denial of Appellant's post-sentence motion on March 2, 2020. On this direct appeal, Appellant's court-appointed counsel has filed both a petition for leave to withdraw as counsel and an accompanying brief pursuant to Anders v. California, 386 U.S. 738 (1967) and Commonwealth v. Santiago, 978 A.2d 349 (Pa. 2009). We conclude that Appellant's counsel has complied with the procedural requirements necessary to withdraw.   Moreover, after independently reviewing the record, we conclude that the instant appeal is wholly frivolous. We, therefore, grant counsel's petition for leave to withdraw and affirm Appellant's judgment of sentence.

_____

[*] Former Justice specially assigned to the Superior Court.

In 2019, Appellant was arrested and charged with multiple crimes, including attempted rape, aggravated indecent assault, and strangulation. The case proceeded to trial on January 21, 2020. However, "immediately after the first witness testified," Appellant requested permission to accept the Commonwealth's earlier, negotiated plea offer and plead guilty. See Trial Court Opinion, 7/13/20, at 1. The Commonwealth agreed.

Under the negotiated agreement, Appellant agreed to plead guilty to aggravated indecent assault, simple assault, and false imprisonment[1] and the Commonwealth agreed to recommend a sentence of two to four years in prison, followed by an undefined term of probation. N.T. Guilty Plea Hearing, 1/21/20, at 5.

The trial court immediately conducted a guilty plea hearing. During the hearing, the Commonwealth incorporated the affidavit of probable cause to establish the factual basis for Appellant's plea. See id. at 9. The affidavit of probable cause reads:

> This known victim will be referred to as "Jane Doe." Jane Doe will be available for all court proceedings.
>
> . . .
>
> According to Jane Doe, [at approximately 4:00 a.m. on July 5, 2019,] she was awoken from sleep because she felt a weight in her bed. Jane Doe stated that this unknown weight caused her to turn around to see an unknown male, [the alleged perpetrator ("the AP"), lying] in her bed with his pants down and his tee shirt on his head, partially concealing

_____

[1] 18 Pa.C.S.A. §§ 3125(a)(1), 2701(a)(1), and 2903(a), respectively.

his face. Jane Doe stated the AP grabbed her arms and held her down on the bed. According to Jane Doe, she began fighting to get the AP off of her, while yelling for "help", but he would not release her. Jane Doe stated that during the struggle the two of them fell off of the bed. Jane Doe stated while they were on the ground, she was trying to grab her cell phone, but she was initially unable to reach it. After a continued struggle on the floor, Jane Doe was able to reach her cell phone, but the AP forcibly grabbed it from her hand, and threw it out of sight. The AP proceeded to try and force Jane Doe's head towards his penis, but Jane Doe continued to struggle, and she did not make contact with his penis.

Jane Doe [stated] that the AP pushed her back onto the bed, and removed her underwear. Jane Doe stated the AP touched her vagina with his fingers, and digitally penetrated her vagina. The AP proceeded to attempt, numerous times, to insert his penis into her vagina, but due to the struggle, the AP's penis missed her vagina, and did not penetrate her. Jane Doe stated that while the struggle was ensuing, she bit the AP's right hand, to the point that it made him bleed. (Jane Doe's shirt had blood on it, which [hospital] staff members confirmed was not hers due to her having no cut or puncture wounds; Detective Freeman collected Jane Doe's shirt as evidence). The AP asked Jane Doe to release him, and told her, "I'll just go, I'll just go." Jane Doe did release his hand, but the AP continued the assault. At this point, Jane Doe grabbed the AP's shirt[] that was covering his face, moved it down to his neck, and began attempting to choke him in order to end the assault. Jane Doe stated that at one point it seemed like the AP lost the ability to [breathe], and she was able to escape from the bed.

Jane Doe stated that she then moved towards the kitchen, with the intention of getting a knife, and while doing so, she still had a hold of the AP's shirt and was trying to pull him with her. While she was moving towards the kitchen, the AP grabbed her by the neck and began choking her. Jane Doe was able to free herself from the AP's grasp, and as she moved into the kitchen, she observed her rear doors, the main door and screen door, were both wide open. Jane Doe stated that she took this opportunity to escape. Jane Doe released the AP's shirt and ran out of the door to the emergency notification system where she alerted police that

she needed help. Jane Doe stated the AP then ran the opposite direction of her, making a left hand turn onto Oakland Avenue; Jane Doe stated the AP's clothes were back in order, and his shoes were on. Jane Doe noted that while in the kitchen, she noticed the AP's shoes on her kitchen floor, and stated he must have taken them off prior to the assault.

Jane Doe stated that during the assault, the AP attempted to kiss her, but was unsuccessful, and stated his mouth did not make contact on any part of her body. Additionally, Jane Doe stated that during the assault the AP touched her breast above her clothing. Jane Doe stated throughout the assault she was yelling for "help", and telling the AP to "leave".

Jane Doe stated she lives with one roommate, who was not present during the assault. Jane Doe believed that the AP might have had prior knowledge of the door in the rear of her apartment, because it was not easy to see due to [its] position in the residence. There was no visible damage to the door, so Jane Doe believes she must have accidentally left it unlocked. Additionally, Jane Doe stated she sleeps with her light on, but when she awoke to the AP in her bed, the light had been turned off.

Jane Doe described the AP as a dark skinned black male, approximately twenty to twenty-five years old, approximately 5'10" to 6'0" tall, with an athletic build, and short black hair. Jane Doe stated he was wearing a black tee shirt (which was initially around his head, but was worn normally when he left), brown or camouflage shorts, and black ankle high boots with a brown sole.

. . .

Detective Taylor observed video footage of the AP shortly after the assault occurred. The individual depicted in the surveillance footage exactly matched the description provided by Jane Doe; namely, a tall and thin black male with short black hair, wearing a black tee shirt, camouflage shorts, and ankle high boots, with a black top. Additionally, the AP was in the area of the incident location, during the time of the incident, and was walking in a way that is not typical of a normal pedestrian. Rather, he was walking in an elusive manner, cutting through alleys and walking on private

property. The video footage according to Detective Taylor, very clearly shows the AP's clothing, body, and a profile of his face, and also shows that he has a distinct walk. Additionally, the AP has what appears to be a large tattoo, potentially a "sleeve" tattoo, on his right forearm.

University of Pittsburgh (Pitt) Detectives searched their surveillance cameras, and were able to locate the AP prior to and after the assault. While reviewing video footage, Pitt Detective Matta observed the AP walking to the assault, and was immediately reminded of [Appellant], a black male that he has arrested in the past. This previous dealing with [Appellant] allowed Detective Matta to observe [Appellant's] appearance, gait, characteristic[s], etc. Detective Matta stated that the physical description of the AP provided by the victim as well as the surveillance footage depicting the AP shortly after the assault matched that of [Appellant]; both with tall and thin body types, short black hair, and the large tattoo on their right forearms. Additionally, Detective Matta reaffirmed that the AP's gait strongly resembles [Appellant's gait].

Detective Matta stated that he has closely followed [Appellant], purposefully observing his actions, and noted that both the AP and [Appellant] walk with a specific stride and lean, or "hunch", forward while walking. Additionally, Detective Matta stated the way that the AP was observed holding his hands behind his back, walking with the "hunched" forward position, mirrors how he observed [Appellant] walk.

Detective Taylor ran [Appellant] through various police databases, observed numerous photos of him, and obtained his demographic information as well as his criminal history. [Appellant] is a black male, approximately 6'0" tall, with a thin build, weighing approximately 170 pounds. [Appellant's] photos show him with different hair and beards lengths, but there are numerous pictures where he has very short black hair, and minimal facial hair. Additionally, [Appellant] has a large tattoo, which resembles a "sleeve" tattoo, along his right forearm which ends at his hand. All of these features resemble that of the AP.

Detective Taylor learned that [Appellant] is on probation and contacted the Allegheny County Adult Probation office, and spoke with supervisor Michelle McDowell. McDowell stated that [Appellant] reported to the probation office . . . for a pre-scheduled appointment on Tuesday, [July 2, 2019]. Detective Taylor observed video footage from the probation office, and saw that [Appellant] had very short black hair, and minimal facial hair. [Appellant] appeared to be tall and slender, and was wearing ankle high boots, with black tops; the boots appeared to match the boots the AP was seen wearing in the obtained video footage. ([Appellant] also has a Facebook photo in which he is wearing camouflage shorts, with "ties" hanging down on both legs, which appear to match the camouflage shorts, with the same hanging "ties", that the AP was observed wearing in video footage). Additionally, [Appellant] appeared to stand and walk in a "hunched" forward manner, which was consistent with Detective Matta's description of [Appellant's] gait, and also resembled the way the AP was observed walking in surveillance footage.

Since being released from custody, [Appellant] had reported to all of his pre-scheduled check ins: June 18, 2019, June 24, 2019, July 1, 2019 (Phone check in), and July 2, 2019. However, July 8, 2019, the day after the media release of the AP's photograph was sent out to the public, [Appellant] missed his pre-scheduled check in, and has been absconding ever since.

On [July 16, 2019], Allegheny County Crime Lab Forensic Biology Manager, Sara Bitner, provided a report stating that a DNA profile was obtained from the blood stain on Jane Doe's shirt; the blood stain is from when the AP bled on Jane Doe's shirt after she bit his hand. The DNA profile was run through CODIS, and there was one result that matched, which was from an open arson investigation from 2010. . . . [Appellant] was documented in the 2010 report as the person whom the victim believed burned down his house.

. . .

[After Appellant was arrested, Appellant spoke to the police and] provided several accounts of the incident date. On several occasions throughout the interview [Appellant] placed himself at the incident location. What occurred at the

- 6 -

incident location varied greatly in [Appellant's] various versions. In one version [Appellant] would have met this unknown female on the street, and was invited over for sexual relations. In this version, [Appellant] stated that the pair went to the bedroom and he was ultimately assaulted by two unknown males and sex never transpired. Another version of the incident according to [Appellant] was that on the date of the incident he would have been on the front porch of the incident location and that he was charging his phone. [Appellant] stated that as he sat on the front porch, two unknown males and an unknown female began to assault him and dragged him into the house. [Appellant] stated that his blood would have been in the residence due to the assault. [Appellant] stated that he would have been in the bedroom of the unknown female and that during this time he was held down by the two males while the unknown female attempted to perform oral sex on him but he would not allow her. [Appellant] stated that the female also attempted to make him perform oral sex on her which he refused.

While interviewing [Appellant] Detectives observed a healing wound on the hand of [Appellant]. This wound was consistent with the injury Jane Doe stated she inflicted. . . .

Affidavit of Probable Cause, 8/1/19, at 1-6.

During the plea hearing, the Commonwealth additionally stated that Appellant's DNA was found under the victim's fingernails and in the bloodstains that were found on the victim's shirt. N.T. Guilty Plea Hearing, 1/21/20, at 9-11.

After conducting a full colloquy, the trial court accepted Appellant's plea and, on January 21, 2020, the trial court sentenced Appellant to serve the negotiated term of two to four years in prison, followed by four years of probation. Id. at 15.

On February 19, 2020, the trial court granted Appellant leave to file a post-sentence motion nunc pro tunc. Trial Court Order, 2/19/20, at 1.

Appellant filed a timely post-sentence motion the next day and, in this motion, Appellant requested to withdraw his guilty plea. Specifically, Appellant claimed that his plea was not knowingly, intelligently, and voluntarily entered because "he was so shocked by the [] victim's appearance at trial – after having not appeared in court for previously scheduled dates – he was not thinking clearly." Appellant's Post-Sentence Motion, 2/20/20, at 3.

Following a hearing, the trial court denied Appellant's post-sentence motion and Appellant filed a timely notice of appeal. On appeal, Appellant's court-appointed counsel filed a petition for leave to withdraw and counsel accompanied this petition with an Anders brief. The Anders brief raises two claims:

> [1.] Did the trial court err in failing to grant [Appellant's] request to withdraw his guilty plea because of his surprise at the arrival of the main witness and because this surprise rendered him unable to think clearly about whether to proceed with the trial?
>
> [2.] Was the sentence imposed in this case manifestly excessive and an abuse of the sentencing court's discretion?

Appellant's Brief at 6.

Before reviewing the merits of this appeal, this Court must first determine whether appointed counsel has fulfilled the necessary procedural requirements for withdrawing as counsel. Commonwealth v. Miller, 715 A.2d 1203, 1207 (Pa. Super. 1998).

To withdraw under Anders, counsel must satisfy certain technical requirements. First, counsel must "petition the court for leave to withdraw

stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous." Miller, 715 A.2d at 1207. Second, counsel must file an Anders brief, in which counsel:

> (1) provide[s] a summary of the procedural history and facts, with citations to the record; (2) refer[s] to anything in the record that counsel believes arguably supports the appeal; (3) set[s] forth counsel's conclusion that the appeal is frivolous; and (4) state[s] counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

Santiago, 978 A.2d at 361.

Finally, counsel must furnish a copy of the Anders brief to his or her client and advise the client "of [the client's] right to retain new counsel, proceed pro se or raise any additional points worthy of this Court's attention." Commonwealth v. Woods, 939 A.2d 896, 898 (Pa. Super. 2007).

If counsel meets all of the above obligations, "it then becomes the responsibility of the reviewing court to make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous." Santiago, 978 A.2d at 355 n.5; see also Commonwealth v. Yorgey, 188 A.3d 1190, 1197 (Pa. Super. 2018) (en banc) (holding that the Anders procedure requires this Court to review "the entire record with consideration first of the issues raised by counsel. . . . [T]his review does not require this Court to act as counsel or otherwise advocate on behalf of a party. Rather, it requires us only to conduct a review of the record to ascertain if[,] on its face, there are non-frivolous issues that counsel,

intentionally or not, missed or misstated. We need not analyze those issues of arguable merit; just identify them, deny the motion to withdraw, and order counsel to analyze them"). It is only when all of the procedural and substantive requirements are satisfied that counsel will be permitted to withdraw.

In the case at bar, counsel complied with all of the above procedural obligations. We must, therefore, review the entire record and analyze whether this appeal is, in fact, wholly frivolous. Our review begins with the claims Appellant raises in his brief.

On appeal, Appellant first claims that the trial court erred when it denied his post-sentence request to withdraw his guilty plea. Appellant's Brief at 6.

"[A] defendant has no absolute right to withdraw a guilty plea; rather, the decision to grant such a motion lies within the sound discretion of the trial court." Commonwealth v. Muhammad, 794 A.2d 378, 382 (Pa. Super. 2002). We have previously explained:

> Post-sentence motions for withdrawal are subject to higher scrutiny [than pre-sentence motions] since courts strive to discourage entry of guilty pleas as sentence-testing devices. A defendant must demonstrate that manifest injustice would result if the court were to deny his post-sentence motion to withdraw a [] plea. Manifest injustice may be established if the plea was not tendered knowingly, intelligently, and voluntarily. In determining whether a plea is valid, the court must examine the totality of circumstances surrounding the plea. A deficient plea does not per se establish prejudice on the order of manifest injustice.

Commonwealth v. Broaden, 980 A.2d 124, 129 (Pa. Super. 2009) (citations and quotations omitted).

Appellant claims that his plea was not knowingly, intelligently, and voluntarily entered because he was surprised that the victim appeared at trial to testify. He claims that this caused him such "shock" that he agreed to accept the Commonwealth's earlier plea offer, even though he "was not thinking clearly." Appellant's Post-Sentence Motion, 2/20/20, at 3. This claim is frivolous.

As the trial court explained:

> The record in this case is clear that [Appellant] understood the nature of the charges to which he ultimately pled guilty and, therefore, his guilty plea was entered knowingly and intelligently. The [trial] court reviewed all of the charges filed against [Appellant] as well as the charges to which he ultimately pled guilty. The Assistant District Attorney presented a factual basis for the guilty plea and [Appellant] did not object to the presentation of the Assistant District Attorney. . . .
>
> [Appellant] completed an exhaustive written guilty plea colloquy clearly evidencing his awareness of his pertinent constitutional rights including, but not limited to, his right to a jury trial, the presumption of innocence[,] and the fact that [the trial] court was not bound by the terms of the plea agreement[.]
>
> . . . [The trial] court went over some of these rights during an on-the-record colloquy at the sentencing hearing. The [trial] court reviewed the original charges contained in the information and the charges to which [Appellant] pled guilty . . . and [Appellant] indicated that he discussed those charges with his trial counsel. The court specifically outlined the proposed plea agreement and [Appellant] orally affirmed his understanding of the plea agreement[.]

The court clearly explained [Appellant's] rights relating to a jury trial. [Appellant] acknowledged on the record his decision to waive that right. [Appellant] also indicated that he was aware of the maximum potential penalties that could be imposed. The court also asked [Appellant] if anyone had forced him to enter the plea agreement. He responded that he was not forced to enter the plea agreement. [Appellant] stated that he had enough time to speak with his attorney about his case and that he was satisfied with the advice provided by his counsel. [Appellant] explained that his decision to plead guilty was motivated by the fact that he was guilty of the offenses to which he [pleaded] guilty. . . .

The totality of the trial court record indicates that [Appellant] knowingly and voluntarily entered his guilty plea. Certainly, being surprised that a victim-witness appears to testify at trial is not a basis to withdraw a guilty plea. Thus, no manifest injustice has occurred and the motion to withdraw guilty plea was properly denied.

Trial Court Opinion, 7/113/20, at 4-5 (some capitalization omitted).

We agree with the trial court's cogent analysis and conclude that Appellant's first claim on appeal is frivolous.

Next, Appellant claims that the trial court abused its discretion by imposing an excessive sentence. Appellant's Brief at 6. Appellant did not raise this claim at sentencing or in his post-sentence motion. Therefore, the claim is waived. See Pa.R.Crim.P. 720; Pa.R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"); Commonwealth v. Cartrette, 83 A.3d 1030, 1042 (Pa. Super. 2013) ("issues challenging the discretionary aspects of a sentence must be raised in a post-sentence motion or by presenting the claim to the trial court during the sentencing proceedings. Absent such efforts, an objection to a discretionary aspect of a sentence is waived"). Further, since this issue has

been waived, Appellant's claim on appeal is frivolous. See Commonwealth v. Kalichak, 943 A.2d 285, 291 (Pa. Super. 2008) (holding that when an issue has been waived, "pursuing th[e] matter on direct appeal is frivolous").

We have independently considered the claims raised within Appellant's brief and we have determined that the claims are frivolous. In addition, after an independent review of the entire record, we see nothing that might arguably support this appeal. The appeal is therefore wholly frivolous. Accordingly, we affirm Appellant's judgment of sentence and grant counsel's petition for leave to withdraw.

Petition for leave to withdraw appearance granted. Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/20/2020